JS-6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>CIVIL MINUTES -- GENERAL</u>

Case No.     **CV 18-256-JFW(PLAx)**                                        Date: July 12, 2018

Title:   Alliance for Constitutional Sex Offense Laws Inc., et al. -v- Department of State, et al.

---

**PRESENT:**

   **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

   **Shannon Reilly**                                          **None Present**
   **Courtroom Deputy**                                      **Court Reporter**


**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
            None                                                                  None

**PROCEEDINGS (IN CHAMBERS):**       ORDER GRANTING DEFENDANTS' MOTION TO
                                                          DISMISS [filed 4/25/18; Docket No. 25]

     On April 25, 2018, Defendants United States Department of State and John J. Sullivan, in his official capacity as Acting Secretary of State (collectively, "the Department"), filed a Motion to Dismiss.  On May 25, 2018, Plaintiffs Alliance for Constitutional Sex Offense Laws, Inc., John Doe #1, and John Doe #2 (collectively, "Plaintiffs") filed an Opposition.  On June 25, 2018, the Department filed its Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's July 9, 2018 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.        BACKGROUND AND INTRODUCTION**

   **A.       Legislative and Administrative Background**

         **1.       State and Federal Sex Offender Registration/Notification Programs**

     Sex offender registration and notification programs have been in place in the United States for more than 25 years.  States began to develop sex offender registration programs in the late 1980s in an attempt to protect the public, especially children, from repeat offenders.  *See* H.R. Rep. 109-218(I) at 28 (Sept. 9, 2005), 2005 WL 2210642 (Leg. Hist.).  Congress enacted the first federal standards to set minimum criteria for sex offender registration in 1994.  *See* Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act ("Wetterling Act"), Pub. L. No. 103-322, § 170101, 108 Stat. 1796 (1994); *see also* H.R. Rep. 103-392 at 6,

1993 WL 484758 (Leg. Hist.). The Wetterling Act used the federal spending power to encourage states to adopt sex offender registration laws. *See U.S. v. Kebodeaux*, 133 U.S. 2496, 2501 (2013). It also established guidelines for states to track sex offenders, particularly when they moved to another jurisdiction. *See* Pub. L. No. 103-322, § 170101(b)(4)-(5); *see also* H.R. Rep. 103-392 at 6. By May 1996, all 50 states, as well as the District of Columbia, had registration systems for released sex offenders in place. *See* H.R. Rep. 105-256 at 6 (1997), 1997 WL 584298 (Leg. Hist.).

In the early 1990s, states began enacting registry and community-notification laws to monitor the whereabouts of individuals convicted of sex crimes. *See Nichols v. U.S.*, 136 S.Ct. 1113, 1116 (2016); *see also U.S. v. Crowder*, 656 F.3d 870, 872 (9th Cir. 2011). In particular, during the mid-1990s, every state plus the District of Columbia passed a "Megan's Law" (named after 7-year-old Megan Kanka, who was raped and murdered by a neighbor). *See, e.g.,* Cal. Pen. Code § 290.46 (requiring California Department of Justice to make available on an Internet website certain information about persons who are required to register as sex offenders); *see also Doe v. Brown*, 177 Cal. App. 4th 408 (2009).

In January 1996, Congress enacted the federal Megan's Law, Pub. Law 104-145, 110 Stat. 1345 (1996) (codified at 42 U.S.C. § 14071), which, in order to protect the public, provided for dissemination of information from state sex offender registries, and required state and local law enforcement agencies to release necessary information to federal, state, and local officials responsible for law enforcement activities or for running background checks pursuant to the National Child Protection Act, 42 U.S.C. § 5119, *et seq*.

In 1996 Congress also enacted the Pam Lyncher Sex Offender Tracking and Identification Act of 1996 ("Lyncher Act"), Pub. L. 104-236, 110 Stat. 3093 (1996) (codified at 42 U.S.C. § 14072), which required the Attorney General to establish a national database (the National Sex Offender Registry or "NSOR") so that the Federal Bureau of Investigation ("FBI") could track certain sex offenders. This national database allowed the FBI to disseminate information as necessary to protect the public. It also provided notification to the FBI and state agencies when certain sex offenders moved to other jurisdictions.

In 1997, Congress enacted the Jabob Wetterling Improvements Act, Pub. Law No. 105-119, 111 Stat. 2441 (1997), which amended the Wetterling Act, the Lyncher Act, and other federal statutes, by adding requirements regarding sex offender registration and tracking. Both the Supreme Court and the Ninth Circuit have upheld sex offender registration and notification requirements against various constitutional challenges. *See, e.g., Smith v. Doe*, 538 U.S. 84, 105-06 (2003); *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003); *Litmon v. Harris*, 768 F.3d 1237 (9th Cir. 2014); *U.S. v. Juvenile Male*, 670 F.3d 999, 1012 (9th Cir. 2014); *Am. Civ. Liberties Union of Nev. v. Masto*, 670 F.3d 1237 (9th Cir. 2012); *Doe v. Tandeske*, 361 F.3d 594, 597 (9th Cir. 2004).

    **2.**    **SORNA**

In 2006, Congress moved towards a comprehensive set of federal standards to govern state sex offender registration and notification programs by enacting the Sex Offender Registration and Notification Act ("SORNA"), as part of the Adam Walsh Child Protection and Safety Act. Pub. L.

No. 109-248, §§ 102-155, 120 Stat. 587(codified in part at 42 U.S.C. §§ 16901 et seq.); *see* H.R. Rep. 109-218(I), at 27 (emphasizing "gaps and problems with existing Federal and State laws" due to "lack of uniformity" in state registration requirements and notification obligations); *see also Nichols*, 136 S.Ct. at 1119 (SORNA was intended to "make more uniform what had remained 'a patchwork of federal and 50 individual state registration systems,' with 'loopholes and deficiencies' that had resulted in an estimated 100,000 sex offenders becoming 'missing' or 'lost'.") (citation omitted).

Congress enacted SORNA (which replaced the Wetterling Act in part) "[i]n order to protect the public from sex offenders and offenders against children . . . ." 42 U.S.C. § 16901. To this end, SORNA established "a comprehensive national system for the registration of those offenders." *Id.* SORNA "requires those convicted of certain sex crimes to provide state governments with (and to update) information, such as names and current addresses, for inclusion on state and federal sex offender registries." *Reynolds v. U.S.*, 565 U.S. 432, 434 (2012). SORNA also makes it a crime for a person who is "required to register" under the Act and who "travels in interstate or foreign commerce" to knowingly fail to register or update a registration. *Id.* (citing 18 U.S.C. § 2250(a)).

As spending clause legislation, SORNA conditions full Byrne Justice Assistance Grant funding on a state's implementation of certain requirements. *See* 42 U.S.C. § 16925(a) (states that fail to substantially implement the federally mandated requirements, as determined by the Attorney General each year, "shall not receive 10 percent of the [criminal justice funding from the federal government] that would otherwise be allocated for that fiscal year . . .."). SORNA requires state registries to collect specific information, such as names, addresses, physical descriptions, criminal history information, and photographs of offenders. *Id.* § 16914(a), (b). It also sets minimum periods of registration based on the nature and seriousness of the sex offense and the offender's history of recidivism, *see id.* §§ 16911(2)-(4), 16915, and requires states to notify certain federal agencies and other jurisdictions regarding the status of its registrants, *id.* § 16921. In addition, SORNA provides for public dissemination of certain information on Internet sites. *Id.* § 16918.

At the federal level, SORNA directs the Attorney General, Secretary of State, and Secretary of Homeland Security to "establish and maintain a system for informing the relevant jurisdictions about persons entering the United States who are required to register." 42 U.S.C. § 16928. SORNA also re-authorized the NSOR, which includes information about all individuals required to register in any state registry, *id.* § 16919, and the National Sex Offender Public Website, which allows anyone to search for such information by name or within specified areas, *id.* § 16920; *see* http://www.nsopw.gov. SORNA also tasked the United States Marshals Service ("USMS") as the federal agency primarily responsible for enforcing sex offender registration requirements.

### 3.     SORNA Guidelines and USMS International Notification Efforts

Pursuant to Congress' directive in SORNA, 42 U.S.C. § 16912(b), the Attorney General issued National Guidelines for Sex Offender Registration and Notification ("SORNA Guidelines") in July 2008. *See* 73 Fed. Reg. 38030 (July 2, 2008), 2008 WL 2594934 (F.R.) 1. In issuing the SORNA Guidelines, the Attorney General noted that the effectiveness of registration and notification systems in states and other non-federal jurisdictions "depends on . . . effective arrangements for tracking of registrants as they move among jurisdictions," and that without such tracking, a registered sex offender could "simply disappear from the purview of the registration

authorities by moving from one jurisdiction to another." 73 Fed. Reg. at 38045. The original SORNA Guidelines were in large part aimed at strengthening the nationwide network of registration programs in order to avoid that result. *Id.*

Moreover, while "[a] sex offender who moves to a foreign country may pass beyond the reach of U.S. jurisdictions," including any jurisdiction's registration requirements, "effective tracking of such sex offenders remains a matter of concern to the United States." *Id.* at 38066. Not only may such sex offenders return to the United States, but, as part of any "cooperative efforts between the Department of Justice" (including the USMS) and agencies of foreign countries, "foreign authorities may expect U.S. authorities to inform them about sex offenders coming to their jurisdictions from the United States, in return for their advising the United States about sex offenders coming to the United States from their jurisdictions." *Id.* Accordingly, the original SORNA Guidelines directed state registries to require registrants to notify the registry if they intended to live, work, or attend school outside the United States; the registry in turn was required to notify the USMS. *See id.* at 38067.

In May 2010, in a notice of proposed supplemental SORNA Guidelines, the Attorney General indicated that federal agencies were continuing to develop "a system for consistently identifying and tracking sex offenders who engage in international travel," and that in furtherance of that effort, he was adding a requirement to the SORNA Guidelines that registrants "must be required to inform their residence jurisdiction of intended travel outside of the United States at least 21 days in advance of such travel." 75 Fed. Reg. 27362-02, 27364 (May 14, 2010), 2010 WL 1923569 (F.R.). Final supplemental SORNA Guidelines that included this requirement were issued in January 2011. 76 Fed. Reg. 1630-01, 1637-38 (Jan. 11, 2011), 2011 WL 65547 (F.R.).

The international notification efforts that the Attorney General referenced were underway by 2011, and included joint operations by USMS, in cooperation with the United States' INTERPOL bureau, pursuant to USMS' law enforcement authority under 42 U.S.C. Section 16941(a) and 18 U.S.C. Section 2250. *See Doe v. Kerry*, 2016 WL 5339804, at * 3 (N.D. Cal. Sept. 23, 2016). USMS primarily relies on advance notifications provided by registered sex offenders, when available, as well as information obtained from the Department of Homeland Security ("DHS") derived from a comparison of passenger data with information in NSOR, to identify registered sex offenders about to travel outside the United States, and to notify foreign authorities in the destination country regarding the travel plans of these individuals. *Id.*

### 4. Previous Federal Efforts to Address Child Sex Trafficking/Tourism Abroad

In addition to its concerns regarding the dangers posed by registered sex offenders who travel internationally, Congress has also long recognized the specific problems of international child sex trafficking and child sex tourism. In 1910, Congress enacted the White-Slave Traffic (Mann) Act, which, among other things, prohibits the transport of minors in foreign commerce for the purpose of prostitution. *See* Act of June 25, 1910, ch. 395, 36 Stat. 825 (1910) (codified as amended at 18 U.S.C. §§ 2421-2424).

In 1994, Congress amended the Mann Act by adding a provision criminalizing travel to another country for the purpose of engaging in sexual activity with a minor. *See* Pub. L. No.

103-322, § 160001(g), 108 Stat. 1796 (1994) (codified as amended at 18 U.S.C. § 2423(b)); *see also United States v. Bredimus*, 234 F. Supp. 2d 639, 644 (N.D. Tex. 2002) (upholding Section 2423(b) as valid exercise of Congressional power under Commerce Clause, which is "broad enough to include individuals who travel in foreign commerce for the purpose of engaging in sexual activity with minors"), *aff'd*, 352 F.3d 200 (5th Cir. 2003).

Despite these efforts, Congress determined that individuals from the United States unfortunately continue to engage in child sex tourism.  *See* H.R. Rep. 107-525 (June 24, 2002), 2002 WL 1376220 (Leg. Hist.) ("child-sex tourism is a major component of the worldwide sexual exploitation of children and is increasing[;]" due to limited resources of foreign governments in combating such offenses, "[t]he Justice Department, Federal law enforcement agencies, the State Department and other U.S. entities expend significant resources assisting foreign countries most afflicted with sex tourism to improve their domestic response to such criminal offenses").

In 2007, DHS initiated an international notification program specifically focused on the risks involved with sex offenders crossing international borders in order to engage in child sex tourism.  *See Kerry*, 2016 WL 5339804, at *4.  The program, known as "Operation Angel Watch," originated in the Los Angeles office of United States Immigration and Customs Enforcement's ("ICE") Homeland Security Investigations ("HSI"), and focused on individuals traveling from Los Angeles International Airport to Southeast Asian countries known for sex tourism.  *Id.*  In 2010, the Operation Angel Watch program was transferred from the Los Angeles office to ICE HSI national headquarters.  *Id.*

The purpose of Operation Angel Watch was to identify individuals who have been convicted of sexual crimes against children and who have upcoming travel plans, and, when appropriate, to notify law enforcement and/or border security officials that those individuals would be seeking entry into the destination country.  *Id.*  Operation Angel Watch operates with the law enforcement authority under Title 19 of the United States Code and bilateral agreements with foreign governments.  *Id.*; *see* 19 U.S.C. § 1589a (authorizing "customs officers"—which include ICE HSI Special Agents, *see* 19 U.S.C. § 1401(I)—to investigate any violation of federal law, including violations of 18 U.S.C. § 1591 (sex trafficking of children or by force, fraud, or coercion), 18 U.S.C. § 2251 (sexual exploitation of children), and 18 U.S.C. § 2423 (discussed above)); 19 C.F.R. § 103.33 (providing authorization, pursuant to 18 U.S.C. § 1628(a)(1), to customs officers to exchange information or documents with foreign customs and law enforcement agencies if necessary to "[e]nsure compliance with any law or regulation enforced or administered by [DHS]").

Operation Angel Watch compares passenger information received from carriers pursuant to 19 C.F.R. Section 122.75a (via electronic departure manifest) with NSOR data to identify registered sex offenders whose offenses involved child victims, and it provides notifications to destination countries when it determines, based on an assessment of various factors, that there is a likelihood that an individual intends to engage in child sex tourism.  *See Kerry*, 2016 WL 5339804, at *5.  According to ICE News Releases in June 2015 and February 2016, ICE HSI, through Operation Angel Watch, provided notice of travel from the United States of approximately 2,300 convicted child sex offenders in 2014, and 2,100 such offenders in 2015.

      **5.**      **International Megan's Law**

On February 8, 2016, the International Megan's Law ("IML") was signed into law. The purpose of the IML is to "protect children and others from sexual abuse and exploitation, including sex trafficking and sex tourism." IML, Preamble. "Law enforcement reports indicate that known child-sex offenders are traveling internationally[,]" and that "[t]he commercial sexual exploitation of minors in child sex trafficking and pornography is a global phenomenon," with millions of child victims each year. IML §§ 2(4), (5); 42 U.S.C. § 16935(4), (5).

As previously noted, the SORNA provisions of the 2006 Adam Walsh Act were intended to "protect children and the public at large by establishing a comprehensive national system for the registration and notification to the public and law enforcement officers of convicted sex offenders." IML § 2(3); 42 U.S.C. § 16935(3). The IML strengthens and further integrates the previously-existing USMS notification program and Operation Angel Watch, and attempts to close a loophole that otherwise allows registered sex offenders to evade such notifications. SORNA ("Sex Offender Registration and Notification") and the IML ("Advanced Notification of Traveling Sex Offenders") are codified at Part A and Part A-1, respectively, of Chapter 151, Subchapter 1 ("Sex Offender Registration and Notification") of Title 42 of the U.S. Code. To carry out its mission, the IML contains two specific provisions—the "passport identifier" provision and the "notification" provision—that are specifically designed to identify sex offenders who may pose a danger to minors and to advise other countries that an individual entering a country has been convicted of a sex crime against a minor.

### a. Passport Identifier Provision

Prior to the passage of the IML, a sex offender who provided notice of travel to one specific country would appear on a flight manifest as traveling to that country, but might then travel from that first destination country to a different destination without notifying authorities, thereby escaping detection by U.S. authorities. In order to focus specifically on registered sex offenders whose offenses involved child victims, the IML prevents such offenders "from thwarting I[ML] notification procedures by country hopping to an alternative destination not previously disclosed," by directing the State Department to "develop a passport identifier" that would allow such individuals to be identified once they arrive at their final destination. *See* 162 Cong. Rec. H390 (daily ed. Feb. 1, 2016) (statement of Rep. Smith).

Section 4 of the IML provides for the establishment, by the Secretary of Homeland Security, of an "Angel Watch Center" within the Child Exploitation Investigations Unit of ICE. IML § 4(a); 42 U.S.C. § 16935b(a). The IML tasks the Angel Watch Center with determining whether "individuals traveling abroad are listed on the [NSOR]" or whether they meet the criteria for inclusion on the NSOR, and providing the USMS with a list of such individuals to determine compliance with SORNA. *Id.* § 4(e); 42 U.S.C. § 16935b(e).

The IML also provides that the Angel Watch Center shall "provide a written determination to the Department of State regarding the status of an individual as a covered sex offender . . . when appropriate." IML § 4(e)(5); 42 U.S.C. § 16935b(e)(5). For purposes of IML Section 4, the term "sex offender" means either a "covered sex offender" (defined as "an individual who is a sex offender by reason of having been convicted of a sex offense against a minor," *see* IML § 3(3), 42 U.S.C. § 16935a(3)), or "an individual required to register under the sex offender registration

program of any jurisdiction or included in the [NSOR], on the basis of an offense against a minor" (as defined in IML § 4(f), 42 U.S.C. § 16935b(f)).  IML Section 8 amends Title II of Public Law 110-457 by adding Section 240, "Unique Passport Identifiers for Covered Sex Offenders."  After receiving a written determination from the Angel Watch Center that an individual is a "covered sex offender"—defined as any individual who is a sex offender under IML Section 4(f), and who is currently required to register under the sex offender registration program of any jurisdiction, *see* 22 U.S.C. § 212b(c)—the Secretary of State is prohibited from issuing a passport to any such individual unless it includes a "unique identifier," and may revoke a passport previously issued without such a unique identifier.  22 U.S.C. § 212b(b). "Unique identifier" is defined as "any visual designation affixed to a conspicuous location on the passport indicating that the individual is a covered sex offender."  22 U.S.C. § 212b(b), (c)(2)).

IML Section 8 directs the Secretary of State to take the specified actions only upon receipt of the written determination from the Angel Watch Center "through the process developed for that purpose under [IML Section 9]."  The passport-identifier provisions became effective on September 27, 2016, and received certification from the "Secretary of State, the Secretary of Homeland Security, and the Attorney General that the process developed and reported to the appropriate congressional committees under [Section 9 of the IML] ha[d] been successfully implemented."  *See* 22 U.S.C. § 212b(f).  Pursuant to IML Section 9, the State Department, the Department of Justice, and DHS were required to develop a plan to implement the passport identifier provisions (as well as the notification provisions)—specifically, to describe the proposed process, provide a timeline and plan for implementation of the process, and identify the resources required to effectively implement the process—and to submit the plan to eight separate congressional committees.  IML § 9; 42 U.S.C. § 16935f.  The Secretaries of DHS and State, and the Attorney General were also required to report to and consult with the appropriate congressional committees. See 42 U.S.C. § 16935f(a), (b).

### b. Notification Provision

The Operation Angel Watch and USMS notification programs in effect prior to the enactment of the IML utilized procedures to identify only registered sex offenders who traveled.  *See Kerry*, 2016 WL 5339804, at * 6.  Accordingly, the IML built on the established notification programs in order to provide advance notice to other countries when registered sex offenders in the United States intend to travel internationally, while also encouraging reciprocal arrangements with foreign governments to provide notifications by those countries when sex offenders seek to travel to the United States.  *See* IML Preamble & § 7.

The Angel Watch Center established by IML Section 4(a) was designed to continue the activities of the former Operation Angel Watch.  Among other things, the IML provides that when the Angel Watch Center has identified internationally traveling individuals convicted of sexual offenses against minors, and where certain conditions are satisfied, the Center "may transmit relevant information to the destination country about [the] sex offender."  *See* IML § 4(e)(1)-(3); 42 U.S.C. § 16935b(e)(1)-(3).

The IML also continues the USMS' notification program, and provides that USMS, through

its National Sex Offender Targeting Center, "may . . . transmit notification of international travel of a sex offender to the destination country of the sex offender, including to the visa-issuing agent or agents" of the destination country, and also may "share information relating to traveling sex offenders with other Federal, State, local, and foreign agencies and entities, as appropriate." See IML § 5(a)(1), (2); 42 U.S.C. § 16935c(a)(1), (2)).

Such notifications may be transmitted "through such means as are determined appropriate" by USMS, "including through the INTERPOL notification system and through Federal Bureau of Investigation Legal attaches [sic]." Id. § 5(e); 42 U.S.C. § 16935c(e). In addition, USMS may "receive incoming notifications concerning individuals seeking to enter the United States who have committed offenses of a sexual nature." Id. § 5(a)(3); 42 U.S.C. § 16935c(a)(3)). Any such incoming notification must be provided immediately to DHS. Id.

The notification provisions in IML Section 4 (Angel Watch Center) and IML Section 5 (USMS) apply to individuals who have been convicted of a sex offense against a minor, as well as to those required to register with a sex offender registry on the basis of an offense against a minor. IML §§ 4(f), 5(h); 42 U.S.C. §§ 16935b(f), 16935c(h).

If the Angel Watch Center or the USMS decide not to transmit a notification abroad regarding a sex offender who intends to travel, the IML directs that it collect relevant data regarding that non-notification decision. IML §§ 4(e)(6)(C), 5(f)(3); 42 U.S.C. §§ 16935b(e)(6)(C), 16935c(f)(3). Both the Angel Watch Center and USMS are also directed to establish procedures to receive, review, and respond to complaints from individuals "affected by erroneous notifications[;]" to take action to ensure that a notification or information regarding the individual is not erroneously transmitted to a destination country in the future; and to provide annual reports to the "appropriate congressional committees" as to the number of erroneous notifications and the actions taken to prevent similar errors from occurring in the future. IML §§ 4(e)(7), 5(g); 42 U.S.C. §§ 16935b(e)(7), 16935c(g).

### 6.     The Department's Final Rule on Passport Identifiers

On September 2, 2016, the Department published a Final Rule in the Federal Register implementing the passport identifier provision required by the IML. The Final Rule updated Section 51.60 of subpart E in part 51 of Title 22 of the Code of Federal Regulations and incorporated new provisions relating to denial and revocation of passports for covered sex offenders. Specifically, the Final Rule added Section 51.60(a)(4), which provides that a passport may be denied or restricted to an applicant who is a "covered sex offender as defined in 42 U.S.C. Section 16935a, unless the passport, no matter the type, contains the conspicuous identifier placed by the Department as required by 22 U.S.C. 212b." The Final Rule also added Section 51.60(g), which provides that "the Department shall not issue a passport card to an applicant who is a covered sex offender as defined in 42 U.S.C. Section 1935a." As the Department explained, the Final Rule provides for denial of passport cards to covered sex offenders because the passport cards "are not able to [physically] contain the unique identifier required" by 22 U.S.C. Section 212b. The Department also indicated that the Final Rule was implemented "without notice and comment under the good cause exemption of 5 U.S.C. Section 553(b)" because the Final Rule "implements the Congressional mandates within the . . . IML." The Department further explained that it believed that "public comment" on the Final Rule was "unnecessary, impractical, and contrary to the public

interest."

On September 27, 2016, the Department issued a correction to the Final Rule. In the correction, the Department added the following paragraph: "Pursuant to 22 U.S.C. 212b(f), Section 51.60(a)(4) and (g) shall not be applied until the Secretary of State, the Department of Homeland Security, and the Attorney General certify to Congress that the process they developed and reported to Congress has been successfully implemented. Updates regarding the implementation of these sections . . . will be posted on http://travel.state.gov." Dep't of State, Correction, 81 Fed. Reg. 66184-01 (Sept. 27, 2016).

As reflected in the Department's Foreign Affairs Manual ("FAM"), the Department has established procedures for indicating "the circumstances under which a passport was issued or can be issued", including whether "[t]he bearer has a certain status" or whether "[t]here is some other relevant information about the bearer of the passport" that would require the insertion of an endorsement—in the form of written text—in a passport book. *See* 7 FAM 1310 app. B(a). The Department issues changes to the FAM, including changes to the list of endorsements in 7 FAM 1320 Appendix B, through a procedure known as Change Transmittals. As a result, to implement the IML's passport identifier requirement, the Department issued a Change Transmittal, which added a new endorsement. The endorsement, designated by code 79, simply states, "The bearer was convicted of a sex offense against a minor, and is a covered sex offender pursuant to 22 U.S.C. Section 212(b)(c)(1)." CON-736 (Oct. 4, 2017) (identifying changes to 7 FAM 1320 app. B).

On October 30, 2017, in accordance with its announcement in the Federal Register, 81 Fed. Reg. 66184-01, the Department posted an update regarding the IML passport provision on the Department's website, http://travel.state.gov. The update indicated that the "IML prohibits the Department of State from issuing a passport to a covered sex offender without a unique identifier, and it allows for the revocation of passports previously issued to these individuals that do not contain the identifier." The update further provided that the "identifier is a passport endorsement, currently printed on the inside back cover of the passport book, which reads: 'The bearer was convicted of a sex offense against a minor, and is a covered sex offender pursuant to 22 United States Code Section 212(b)(c)(1).' Since endorsements cannot be printed on passport cards, covered sex offenders cannot be issued passport cards."

### B.     Procedural History

On January 11, 2018, Plaintiffs filed a complaint against Defendants alleging two claims for relief under the Administrative Procedure Act ("APA"). First, Plaintiffs allege that the Department violated the APA by issuing the September 2, 2016 Final Rule and the October 30, 2017 "press release" on the Department's website without first proceeding through the notice and comment procedures for agency rulemaking. In addition, Plaintiffs allege that the Department exceeded its authority when it determined that it would not issue passport cards to covered sex offenders, as defined in 22 U.S.C. Section 212(b)(c)(1). Plaintiffs also allege a claim for declaratory relief, which is based on Plaintiffs' two claims for violation of the APA.

On April 25, 2018, the Department filed its Motion to Dismiss pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure on the grounds that the Complaint fails to state a claim upon which relief may be granted.  Defendants also moved to dismiss the Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure on the grounds that the Court lacks subject matter jurisdiction over this matter.

## II.     LEGAL STANDARD

### A.     Rule 12(b)(1)

The party mounting a Rule 12(b)(1) challenge to the Court's jurisdiction may do so either on the face of the pleadings or by presenting extrinsic evidence for the Court's consideration.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Rule 12(b)(1) jurisdictional attacks can be either facial or factual").  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In ruling on a Rule 12(b)(1) motion attacking the complaint on its face, the Court accepts the allegations of the complaint as true.  *See, e.g., Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Safe Air*, 373 F.3d at 1039.  "With a factual Rule 12(b)(1) attack . . . a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment.  It also need not presume the truthfulness of the plaintiff['s] allegations."  *White*, 227 F.3d at 1242 (internal citation omitted); *see also Thornhill Pub. Co., Inc. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979) ("Where the jurisdictional issue is separable from the merits of the case, the judge may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary. . . '[N]o presumptive truthfulness attaches to [a] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'") (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (9th Cir. 1977)). "However, where the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial."  *Augustine v. U.S.*, 704 F.2d 1074, 1077 (9th Cir. 1983).  It is the plaintiff who bears the burden of demonstrating that the Court has subject matter jurisdiction to hear the action. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989).

### B.     Rule 12(b)(6)

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint.  "A Rule 12(b)(6) dismissal is proper only where there is either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'"  *Summit Tech., Inc. v. High-Line Med. Instruments Co., Inc.*, 922 F. Supp. 299, 304 (C.D. Cal. 1996) (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)).  However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(internal citations and alterations omitted).  "[F]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*

In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party.  *See, e.g., Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).  "However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations."  *Summit Tech.*, 922 F. Supp. at 304 (citing *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981) *cert. denied*, 454 U.S. 1031 (1981)).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990) (citations omitted).  However, a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201 without converting the motion to dismiss into a motion for summary judgment.  *See, e.g., id.*; *Branch v. Tunnel*, 14 F.3d 449, 454 (9th Cir. 1994).

Where a motion to dismiss is granted, a district court must decide whether to grant leave to amend.  Generally, the Ninth Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted.  *See, e.g., DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).  However, a Court does not need to grant leave to amend in cases where a court determines that permitting a plaintiff to amend would be an exercise in futility.  *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile.").

### III.   DISCUSSION

#### A.   Plaintiffs' First Claim Fails Because Notice and Comment Were Not Required

The Department argues that Plaintiffs' first claim for relief alleging that the Final Rule and October 2017 "press release" could not be issued without notice and comment because they are legislative rules fails because they are interpretive rules, which are exempt from the notice and comment requirements.  The APA provides that there should be notice and comment before the promulgation of any agency rule.  5 U.S.C. § 553 (2006).  The APA defines an agency rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . .."  5 U.S.C. § 551(4).  Under the APA, an agency must follow specific procedures before issuing a rule.  "These procedures include: (1) publication of notice of the proposed rule in the Federal Register; (2) a period for interested individuals to comment on the proposed rule; and (3) publication of the adopted rule not less than thirty days before its effective date."  *Mora-Meraz v. Thomas*, 601 F.3d 933, 939 (9th Cir. 2010).  However, "interpretive rules are exempt from the APA's notice and comment requirements."  5 U.S.C. § 553(b)(3)(A).

### 1. The Final Rule Is an Interpretive Rule

Whether an agency rule is interpretive or legislative is a question of law for the Court. *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1086 (9th Cir. 2003). Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (internal quotation marks omitted). These rules "merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule." *Hemp Industries*, 333 F.3d at 1087. "Legislative rules, on the other hand, create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Id.* "Courts have struggled with identifying the difference between legislative and interpretive rules." *Id.* The Ninth Circuit provided guidance to resolving these differences in *Hemp Industries*, which held that a rule has the "force of law and is therefore legislative" when: (1) in the absence of the rule, there would not be an adequate legislative basis for enforcement action; (2) the agency has explicitly invoked its general legislative authority; and (3) the rule effectively amends a prior legislative rule. *Id.* (citing *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993)).

#### a. The Department Did Not Explicitly Invoke Its Legislative Authority

Where Congress explicitly leaves "a gap for [an] agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Rules that are devised under such circumstances are typically considered legislative. *Id.* However, if an agency issues a rule that merely clarifies an ambiguous term in a statute or explains how the statutory provision operates, the rule is considered interpretive. *Id.*

Plaintiffs argue that the Final Rule is legislative because the IML delegates all material decisions regarding the "unique identifier" to the Department's discretion. According to Plaintiffs, the Department did not simply "interpret" the phrase "unique identifier" when it promulgated the Final Rule. Rather, it exercised its discretion to create the substance of the "unique identifier"—including the language, placement and accessibility of the identifier—thereby providing "the missing link" that was necessary to implement the IML. The Court disagrees. The statutory text of the IML left the Department with virtually no discretion with respect to the "unique identifier". Indeed, the IML specifically defines the term "unique identifier" as "any visual designation affixed to a conspicuous location on the passport indicating that the individual is a covered sex offender." Under the IML, a "covered sex offender" is an individual "who is a sex offender, as defined in section 4(f)" of the IML and "is currently required to register under the sex offender registration program in any jurisdiction." Section 4(f) of the IML provides that the term "sex offender" means: "a covered sex offender" or "an individual required to register under the sex offender registration program of any jurisdiction or included in the National Sex Offender Registry, on the basis of an offense against a minor." In addition, the IML also specifically requires that the identifier be "affixed to a conspicuous location on the passport."

Accordingly, it is clear from the language of the Final Rule that the Department was merely carrying out Congress' directive to place the "unique identifier" on relevant passports and, in doing so, clarified the minor ambiguities that existed in the IML regarding the details of the "unique identifier." When comparing the statutory language used by Congress in the IML to the language

that the Department used in the unique identifier—"The bearer was convicted of a sex offense against a minor, and is a covered sex offender pursuant to 22 United States Code Section 212(b)(c)(1)—it is clear that the Department merely adopted the definition of "unique identifier" that was already included in the IML.  *See Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009) (citing *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94–95 (D.C. Cir. 1997)) (explaining that the "distinction between an interpretive rule and a substantive rule . . . likely turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute.").  A regulation that "merely track[s]" statutory requirements and "thus simply explain[s] something that [a] statute already require[s]" is typically interpretive.  *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 237 (D.C. Cir. 1992).  In addition, the Department's determination that the identifier should be placed on the back cover of the passport book merely conforms to Congress' instruction to place it in a "conspicuous location".  Therefore, the Court concludes that the Department did not explicitly invoke its legislative authority when adopting the Final Rule.

### b.     The IML Provides an Adequate Basis for Enforcement

Plaintiffs also argue that the Final Rule is legislative because the IML's "unique identifier" requirement lacks enforceability in the absence of discretionary decision-making by the Department.  According to Plaintiffs, without the exercise of the Department's discretion, the IML's directive to apply a "unique identifier has no teeth, and lacks specific content."  Opp'n 8.  The Court disagrees.

The text of the IML specifically prohibits the Department from issuing a passport to a covered sex offender unless the passport contains a "unique identifier."  Accordingly, there was no legislative gap that required the Department to promulgate the Final Rule as a predicate to enforcement.  *See Hemp Industries*, 333 F.3d 1082, 1088 (9th Cir. 2003) (noting that "if there is no legislative basis for enforcement action on third parties without the rule, then the rule necessarily creates new rights and imposes new obligations", which makes it legislative).  Indeed, it is the language in the IML, not the Final Rule, that requires the Department to place the "unique identifier" on relevant passports and that prohibits the Department from issuing passports to sex offenders unless they contain the "unique identifier."  Accordingly, the Court concludes that the Final Rule merely interprets a requirement set forth in the statute, and it does not exist independently of the statute.  *See Metro Sch. Dist. of Wayne Twp. v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992) (emphasis in original) (internal citation and quotation marks omitted) (describing legislative rules as having "effects *completely independent* of the statute.").

### c.     The Final Rule Did Not Amend a Prior Legislative Rule

Plaintiffs also argue that the Final Rule is legislative because it amended a prior regulation.  However, the Court concludes that even if the Final Rule constituted a change in the passport regulations, the Department was not required to proceed by notice and comment because Plaintiffs have not demonstrated that the prior version of 22 C.F.R. Section 51.60 was a legislative rule or that the Final Rule made any changes other than updating it to reflect the new statutory requirements set forth in the IML.  *See Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004) (holding that an agency can modify an interpretive rule without notice and comment).  Moreover, even if the revised interpretation of the statutory provisions regarding passport rules affects sex

offenders' rights, "that alone is insufficient to trigger the APA's notice-and-comment requirements." *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 91 (D.D.C. 2016). Accordingly, contrary to Plaintiffs' argument, the Court concludes that the Final Rule did not amend a prior legislative rule.

### d. The Department's Treatment of the Final Rule Is Not Dispositive

Plaintiffs also argue that the Department's treatment of the Final Rule during the administrative process supports its argument that the Final Rule is legislative. Although courts consider an agency's characterization of a rule when attempting to determine whether a rule is interpretive or legislative, this characterization is not dispositive, and a "reviewing court need not classify a rule as interpretive [or legislative] just because the agency says that it is." *United States v. Picciotto*, 875 F.2d 345, 348 (D.C. Cir. 1989); *see also Erringer* 371 F.3d at 632 (reiterating that an agency's own treatment of a rule, while relevant, is not dispositive on the issue of whether the rule is interpretive or legislative).[1] Accordingly, the Court concludes that the Final Rule is not legislative merely because the Department published it in the Federal Register.

After carefully considering the three criteria the Ninth Circuit identified in *Hemp Industries*, the Court concludes that Plaintiffs have failed to demonstrate that the Final Rule has the "force of law". Accordingly, the Court concludes that the Final Rule is interpretive and, therefore, the Department was not required to comply with the APA's notice and comment requirements.[2]

### 2. The Department Has Failed to Demonstrate that the Good Cause Exemption Applies

The Department argues that even if the Final Rule is a legislative rule (which the Court concludes it is not), it was not subject to the notice and comment requirements because of the good cause exemption. The good cause exemption permits an agency to skip the notice and comment requirements "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). Courts have cautioned that the good cause exemption should be read narrowly. *See United States Steel Corp. v. United States Envtl. Prot. Agency*, 595 F.2d 207, 214 (5th Cir. 1979).

---

[1] In *American Mining*, the D.C. Circuit listed as a fourth, separate criterion, whether the agency had chosen to publish the rule in the Code of Federal Regulations. "In choosing not to include this criterion in the three-part test in *Hemp Industries*," the Ninth Circuit noted that "publication in the CFR does not necessarily mean that the rule is not interpretive." *Erringer*, 371 F.3d at 632 fn.13 (internal quotation marks omitted).

[2] Notwithstanding Plaintiffs' argument that the 2017 October "press release" is a rule, it is clear from the record that the Final Rule was effective before the 2017 October "press release" appeared on the Department's website and that the Department had already updated the FAM to add a description of the new endorsement. Accordingly, the Court concludes that the 2017 October "press release" was not a rule within the meaning of the APA and, therefore, the APA's notice and comment requirements were not applicable.

When the Department published the Final Rule, it included a brief conclusory statement indicating that "[b]ecause this rulemaking implements the Congressional mandates within the . . . IML, the Department is publishing this rulemaking without notice and comment under the 'good cause' exemption of 5 U.S.C. 553(b)." "The Department believes that public comment on this rulemaking would be unnecessary, impractical, and contrary to the public interest." Because the Department used boilerplate language instead of stating a specific reason it was invoking the good cause exemption, the Court is unable to determine whether good cause existed for the Department's decision to skip the notice and comment requirements.

Although the Department argues that its statement that the Final Rule "implements the Congressional mandates within the . . . IML" provides sufficient justification to apply the good cause exception, the Court disagrees. As an initial matter, this statement appears to conflate the standards governing the determination of when a rule is interpretive versus legislative with the standard used to determine the applicability of the good cause exemption. Indeed, the plain implication of its statement is that the Department is simply implementing the IML (i.e., issuing an interpretive rule) and, therefore, it is not required to follow the notice and comment procedures. Moreover, the statement provides absolutely no basis, factual or otherwise, for the Department's apparent belief that the notice and comment requirements were impractical, unnecessary or contrary to public interest. Given the failure to provide any context for the Department's decision, the Court concludes that the Department has failed to demonstrate that the good cause exemption applies. Although the Department has failed to demonstrate that the good cause exemption applies, it has demonstrated that the Final Rule is interpretive and, therefore, the Department is entitled to judgment in its favor on Plaintiffs' first claim for relief.

### B.     Plaintiffs' Second Claim Fails As a Matter of Law

Plaintiffs allege in their second claim for relief that the Department violated the APA when it promulgated 22 C.F.R. Section 51.60(g) which states that "[t]he Department shall not issue a passport card to an applicant who is a covered sex offender as defined in 22 U.S.C. 212(b)(c)(1)." Plaintiffs argue that the Department lacks the statutory authority to deny passport cards to sex offenders and that the denial of passport cards to registered sex offenders constitutes an abuse of discretion. By contrast, the Department argues that Plaintiffs' second claim should be dismissed because Plaintiffs do not have standing to pursue the claim, and they cannot demonstrate that the Department exceeded its authority or abused its discretion by promulgating 22 C.F.R. Section 51.60(g).

#### 1.     Plaintiffs Lack Standing to Pursue Their Second Claim

The Department argues that Plaintiffs lack standing because they cannot demonstrate that they have suffered any injury in fact that is traceable to the passport card restriction. The standing doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Accordingly, a plaintiff invoking federal jurisdiction bears the burden of establishing "the irreducible constitutional minimum" of standing. *Id.* To satisfy Article III standing, a plaintiff must demonstrate (1) injury in fact; (2) a casual connection between that injury and the complained of conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). To satisfy the injury in fact requirement, a plaintiff must show the

"invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560. For an injury to be particularized, it "must affect [a] plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. An injury is concrete if it actually exists—i.e., it is real rather than abstract. *Id.*

After carefully considering the allegations in the Complaint and the parties' arguments, the Court concludes that Plaintiffs have failed to demonstrate that they have suffered any particularized or concrete harm as a result of the Department's inability to issue a passport card. It is undisputed that despite 22 C.F.R. Section 51.60(g), Plaintiffs may apply for and obtain a passport book, which is valid in those countries where a passport card is recognized and provides broader access to travel (i.e., it can be used for international air travel and is not limited to specific countries). Although Plaintiffs were given ample opportunity in the Complaint and Opposition, they have failed to identify a particularized interest they have in obtaining a passport card, as opposed to a passport book, or that they will suffer actual or imminent harm as a result of the passport card restriction.[3] Plaintiffs' argument that they have suffered an injury because they "would be eligible for passport cards but for the Department's Final Rule" is simply unpersuasive. As the Department argues, Plaintiffs cannot claim any entitlement to a passport card rather than a book because the Department has absolute discretion to determine the form of a passport. Moreover, Plaintiffs' claimed injury in fact is nothing more than a hypothetical, abstract injury, because Plaintiffs have not shown that the failure to obtain a passport card would have any real, appreciable, impact on them. Accordingly, the Court concludes that Plaintiffs have not demonstrated that they have standing to pursue their second claim for relief.

### 2. The Department Did Not Exceed Its Authority or Abuse Its Discretion

Even if Plaintiffs could demonstrate that they have standing, the Court concludes that their second claim for relief fails as a matter of law. Under 22 U.S.C. Section 211a, the Department is vested with broad authority to grant and issue passports "under such rules as the President shall designate and prescribe." Under Executive Order 11295 (August 5, 1996), the President has delegated authority to the Department to "designate and prescribe for and on behalf of the United States rules governing the granting, issuing, and verifying of passports." As other courts have recognized, the term "passport" refers to a general category of official travel documents that comes in multiple formats, including a passport card. *See, e.g., United States v. Casillas-Casillas*, 845 F.3d 623, 626 (5th Cir. 2017). Accordingly, the Department has broad authority to grant and issue passports and to restrict access to particular forms of passports, including passport cards. Moreover, the text of the IML specifically prohibits the Department from issuing a passport—in any form—to a covered sex offender unless the passport contains the required unique identifier. Therefore, the Department did not exceed the scope of its authority when it promulgated the

---

[3] Plaintiffs also argue that they have satisfied the injury in fact requirement because their "possession and use of passport cards is within the zone of interest impacted by the IML and the Department's rulemaking." Opp'n 23 (internal quotation marks omitted). As the Department points out, this argument is only relevant to the issue of statutory standing, which is a separate requirement from Article III standing. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1199 (9th Cir. 2004) (explaining that a plaintiff must satisfy statutory standing in addition to the requirements of Article III standing).

portion of the Final Rule that prohibits sex offenders from obtaining passport cards because the unique identifier will not fit on the cards.

In addition, pursuant to its authority under 22 U.S.C. Section 211a and related executive orders, the Department has established a system of passport endorsements to communicate information about a passport or passport holder.  The internal procedures for processing such endorsements are set forth in 7 FAM 1300 Appendix B.  As the Department points out, before the IML was passed, the Department had already determined that endorsements generally could not be applied to passport cards.  Indeed, it is evident from 7 FAM 1300 Appendix B that the only endorsement that can be applied to a passport card is Endorsement 03, which is designated by the letter R, because the other endorsements are too long to be printed on a passport card. Therefore, Section 51.60(g) merely includes the same restriction applicable to all other endorsements that require text of more than a single letter.  Accordingly, the Court concludes that the Department did have authority to promulgate  22 C.F.R. Section 51.60(g) and that it did not abuse its discretion by refusing to issue passport cards to registered sex offenders.

## IV.     CONCLUSION

For all of the foregoing reasons, the Department's Motion to Dismiss Plaintiffs' first and second claims is **GRANTED**.  In light of the Court's ruling, the Court also **GRANTS** the Department's Motion to Dismiss Plaintiffs' third claim for declaratory relief.  *See Flores v. EMC Mortg. Co.*, 997 F. Supp. 2d 1088, 1112 (E.D. Cal. 2014) (holding that when a plaintiff's other claims are dismissed, a claim for declaratory relief necessarily fails as a matter of law). Accordingly, Plaintiffs' Complaint is **DISMISSED without leave to amend**,[4] and this action is **DISMISSED with prejudice**.

IT IS SO ORDERED.

---

[4]     Leave to amend must be granted unless it is clear that a complaint's deficiencies cannot be cured by amendment.  *Lucas v. Dept. of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995).  When amendment would be futile, dismissal may be ordered with prejudice.  *Dumas v. Kipp.*, 90 F.3d 386, 393 (9th Cir. 1996).  In this case, because Plaintiffs cannot allege any additional facts to avoid dismissal of their claims against the Department, amendment would be futile, and, thus, dismissal without leave to amend is appropriate.